Herman E. MULLER, Jr., as the Executor under the Last Will and Testament of Leopold Stokowski, Plaintiff,

v.

The WALT DISNEY PRODUCTIONS, The Walt Disney Company, and Buena Vista Home Video, Defendants.

No. 93 Civ. 0427 (GLG).

United States District Court, S.D. New York.

May 26, 1993.

Bartlett, Pontiff, Steward & Rhodes, P.C., Glens Falls, NY (Richard J. Bartlett, Mark E. Cerasano, of counsel), Schlam, Stone & Dolan, New York City (Richard H. Dolan, of counsel), for plaintiff.

Sanford M. Litvack, Edward J. Nowak, Walt Disney Co., New York City, Drinker Biddle & Reath, Philadelphia, PA by Patrick T. Ryan, Alfred W. Putnam, Jr., Michael K. Sullivan, Brian S. Mudge, for defendants.

## MEMORANDUM DECISION

GOETTEL, District Judge.

In 1937, Walt Disney and Leopold Stokowski, a world-famous conductor, began a collaboration that culminated in the production of the motion picture "Fantasia" and its release to the movie-going public in 1940. Disney's relationship with Stokowski was defined in a series of written contracts executed between December 16, 1937 and December 14, 1956. As part of their contractual agreements, Stokowski conducted the members of the Philadelphia Orchestra,[1] whose services

---

1. In this decision, the orchestra is referred to as the "Philadelphia Symphony Orchestra" in pas-

sages quoted from the 1939 agreement between Disney and Stokowski. For purposes of this

he had procured, in the playing and recording of the music, arranged by Stokowski, that became the major part of the soundtrack for "Fantasia." [2] The music was completed over the course of four sessions with the orchestra.

"Fantasia's" initial release in November 1940 met with little financial success. However, things changed with the passage of time. In 1991, fifty years later, "Fantasia" was released on home videocassette and laser discs. The result was an unqualified financial success. Indeed, we are told that "Fantasia" is the number one selling videocassette of all time.

Needless to say, at the time Disney and Stokowski commenced their project, few if any could have predicted the advancement in communications technology and the leap of media production onto an international scale. Further, no one likely envisioned that an unsuccessful motion picture would experience a phenomenal revival five decades after its original release. Success, however, has its price. Since the release of "Fantasia" on video, a number of lawsuits have commenced against Disney, mainly stemming from the inability to anticipate in the original contracts concerning the sharing of profits and distribution royalties from the sales of "Fantasia" in media forms not yet in existence when the motion picture was first produced.

In May 1992, the Philadelphia Orchestra Association (the "Association") commenced an action against the Walt Disney Company and Buena Vista Home Video in the federal court for the Eastern District of Pennsylvania. *See The Philadelphia Orchestra Ass'n v. The Walt Disney Co. and Buena Vista Home Video,* 821 F.Supp. 341 (E.D.Pa.1993) (McGlynn, J.). The Orchestra claimed entitlement to a share of the profits resulting from "Fantasia's" sale on home videos based upon, *inter alia,* the 1909 Copyright Law, the Lanham Act, and common law copyright infringement, misappropriation, unfair competition, and conversion. The Association's underlying contention is that it was paid under its contract with Disney for its performance of "Fantasia's" music in conjunction with its release as a feature film but not for use of its performance or name and likeness in home video releases. Resolution of the Association's action will rest, in large part, on the interpretation of a one-page contract, dated January 11, 1939, between the Association and Michael Myerberg, agent for Disney and Stokowski.

On December 30, 1992, Disney filed suit against Herman E. Muller, Jr., the Executor of Stokowski's Last Will and Testament.[3] This action was also filed in the Eastern District of Pennsylvania. *See The Walt Disney Co. v. Muller,* No. 92-CV-7440 (E.D.Pa.) (McGlynn, J.). In it, Disney seeks a declaratory judgment that the Estate of Stokowski retains no rights of any kind related to the sale or distribution of "Fantasia." Disney also demands that Stokowski indemnify it in the event that Disney is deemed liable to the Association for a share of "Fantasia's" profits.

On January 22, 1993, Muller filed suit against The Walt Disney Productions, The Walt Disney Company, and Buena Vista Home Video in the federal court for the Southern District of New York.[4] Muller relies primarily upon the four written agreements executed between Disney and Stokowski that relate to "Fantasia's" production. Many of Muller's claims mirror the claims made by the Association against Disney. In addition, Muller alleges a breach of contract

case, there is no meaningful distinction between the "Philadelphia Orchestra" and the "Philadelphia Symphony Orchestra."

**2.** With the exception of the music accompanying "The Sorcerer's Apprentice" sequence in the film "Fantasia," which was previously performed by a Hollywood Orchestra, the Philadelphia Orchestra performed all the musical compositions for the film.

**3.** Leopold Stokowski died in September 1977, a domiciliary of Scarsdale, New York.

**4.** On the day before Muller filed his suit in New York, the publisher of Igor Stravinsky's "The Rite of Spring" filed suit against Disney in this court seeking a share of the royalties, claiming that a license granted to Disney in 1939 did not encompass "Fantasia's" release on videocassette. In its brief, Disney states that it intends to move to transfer or stay that action as well. For the moment, however, the existence of a second action in this court with claims to the same pool of royalties from "Fantasia" might lend support to retaining this action in this district.

based upon the contractual requirement that Stokowski be given equal billing with Disney on screen and in all advertising and publicity in connection with "Fantasia." Plaintiff contends that Disney ignored this requirement when it released the videocassette version of "Fantasia." Plaintiff also seeks an accounting of the royalty payments due and owing to Stokowski pursuant to the December 14, 1956 agreement.

■ Before the court today is Disney's motion to transfer venue to the Eastern District of Pennsylvania pursuant to 28 U.S.C. § 1404(a). In the alternative, Disney requests a stay of this action pending resolution of the suits in Pennsylvania by Disney and the Association. Naturally, plaintiff opposes this motion.

■ Section 1404(a) of Title 28 reads, "For the convenience of parties and witnesses, in the interests of justice, a district court may transfer any civil action to any other district or division where it might have been brought." The decision of whether to transfer venue rests with the sound discretion of the court. *Filmline (Cross–County) Productions, Inc. v. United Artists Corp.,* 865 F.2d 513, 520 (2d Cir.1989). In making this determination, the court must consider several factors including the convenience of the witnesses and parties, plaintiff's choice of forum, the relative ease of access to sources of proof, the forum's familiarity with the governing law, trial efficiency, and the overarching interests of justice. *See Don King Productions, Inc. v. Douglas,* 735 F.Supp. 522 (S.D.N.Y.1990).

The parties agree that the first factor, convenience of witnesses, is not a major factor in this action since the events involving the creation of "Fantasia" occurred more than fifty years ago. Disney claims that the few witnesses who remain alive will be musicians from the Philadelphia Orchestra and former Disney employees. Disney argues that this gives Philadelphia a slight edge over New York as the most convenient forum for witnesses.

While this factor is certainly not the weightiest in this action, we view it as even

weaker than defendants do. No former Disney employees with information regarding the intent of the parties to the original "Fantasia" contracts and production have been identified. Whether New York or Pennsylvania would be the most convenient forum for them is impossible to say. Indeed, since Disney was based in California during the 1930s and 1940s, California seems a likely contender as the most convenient forum based on witness convenience. Moreover, the contracts in question between Disney and Stokowski were signed in California and Texas.[5]

Further, nothing suggests that any former musicians in the Philadelphia Orchestra who still reside in Pennsylvania (none are identified by name) would offer any evidence relevant to the claims in this action. While they might offer material evidence regarding the Association's claims against Disney, we fail to see how they could shed any evidentiary light on the contractual issues between Disney and Stokowski. There is no indication that they played any role in the events surrounding the execution of the contracts. If any unidentified former musicians are living and still reside in Philadelphia, facts presently unknown, the only thing we might say with certainty is that they might be able to testify to the events concerning the recording of "Fantasia's" musical score. And even that assumes that they can recall any details about events that occurred fifty years ago. Beyond that, any weight they might add onto the balance of convenience is mere speculation at this point.

The second major factor in considering the transfer of venue is the convenience of the parties. Disney argues that Muller's true clients, the beneficiaries of Stokowski's Estate (whoever they may be), have no meaningful connection to New York. Therefore, defendants argue, plaintiff's interest in keeping the action in New York is minimal. Moreover, Disney argues that a substantial part of Stokowski's work on "Fantasia" took place in Philadelphia. The four sessions in 1939 at which "Fantasia's" music was record-

---

5. However, without knowing whether any witnesses are still alive and residing in California, the enormous inconvenience of California for

plaintiff would seem to exclude it as a proper venue for this action.

ed occurred at the Philadelphia Academy of Music. Defendants also contend that Philadelphia was Stokowski's home during the period when he worked on the "Fantasia" project. Thus, Disney argues, this action not only could have been commenced in the Eastern District of Pennsylvania, but trying the case in Philadelphia will provide easier access to its sources of proof.

Aside from conflating the convenience of the parties with access to sources of proof, we view this argument as weak. Disney's convenience does not appear to weigh heavily in Pennsylvania's favor. Although, Disney has already commenced an action against Muller in Philadelphia, to our knowledge, Disney has no offices in Pennsylvania. While headquartered in California, Disney does maintain offices in New York City.

We disagree that plaintiff has only minimal interests in litigating in New York. Stokowski's Estate is located in New York. Stokowski lived out his life in Scarsdale, New York and died a domiciliary of this state. His Last Will and Testament were probated in the Westchester County Surrogate's Court in New York. Moreover, the royalties that Disney has to date paid to Stokowski, or his Estate, were paid through Mr. Muller in New York. Muller, the Executor of Stokowski's Estate, maintains his office in New York City. Obviously, New York was the plaintiff's chosen forum for reasons of his convenience.

The location where the Orchestra recorded the music for "Fantasia" and Stokowski's residence in Philadelphia many years ago may be relevant to claims based upon a failure of the Orchestra or Stokowski to provide the performances called for under their contracts with Disney. They are not relevant to the present issues regarding what performance or royalty rights, if any, Stokowski retained concerning "Fantasia's" release on home video. We are more sensitive to plaintiff's choice of forum in large part because, as a far-reaching commercial enterprise conducting its business nationwide, it is far more convenient for Disney to litigate in New York than Muller to litigate in Pennsylvania. Convenience of the parties clearly favors New York.

As alluded to earlier, nothing suggests that any relevant sources of proof exist in Philadelphia. No witnesses in Philadelphia, or anywhere else, have been identified. To the extent that any Disney documents or personal papers belonging to Stokowski may help interpret the intent of the parties, we presume such evidence exists either in California or New York.

Disney stresses that trial efficiency and familiarity with the governing law favor transfer to the Eastern District of Pennsylvania. Disney's most significant argument is that two actions involving "virtually the same facts and legal issues" have already been commenced in Pennsylvania. Further, Disney points out that the Association's action has already progressed to discovery.

The degree to which the actions between Stokowski and Disney interrelate to the Association's suit against Disney is key. Disney originally commenced its declaratory action against Stokowski in Philadelphia because it was already being sued there by the Association. Now Disney argues that Stokowski's action should be transferred to Philadelphia because these other two actions are already before the Eastern District of Pennsylvania. Disney stresses that thousands of documents have already been produced in conjunction with the Association's case.

It is true that the Association's action and the two actions between Disney and Stokowski all involve "Fantasia." Both Stokowski and the Association are claiming a right to share in the profits from the film's videocassette sales. Since both Stokowski and the Association are claiming 50% of Disney's profits from the sales of "Fantasia" videocassettes and laser discs, Disney is potentially subject to verdicts against it which might equal the total profits from "Fantasia's" video sales.

Disney argues that this fact opens it up to inconsistent verdicts. It does not necessarily follow that Stokowski's claims and the Association's claims rise or fall together. Their claims are based on distinct contracts. Disney could be contractually obligated to share profits with one claimant and not the other. For example, Disney could be held liable for infringement upon the Association's common

law copyright rights without owing Stokowski any additional money under his contracts with Disney. While perhaps unlikely, if Disney failed to contractually secure the rights to use the Orchestra's and Stokowski's performances in subsequent releases of "Fantasia" on home video, something not contemplated in 1939 when the agreements were signed, it could conceivably owe more than one other entity a share of its profits.

The prospect of inconsistent verdicts was lessened by the Eastern District of Pennsylvania's recent decision where the court rejected the Association's argument that it was a joint author of "Fantasia's" musical score. Judge McGlynn held that "a magnificent performance does not a joint author make. When the evidence is viewed in its entirety, it is clear that the orchestra but [sic] was not a joint author of 'Fantasia.'" *The Philadelphia Ass'n, supra,* at 347.

The existence of related litigation in another district is a factor that favors transfer. *National Union Fire Ins. Co. v. Turtur,* 743 F.Supp. 260, 263 (S.D.N.Y.1990). However, it is only one factor to consider and balance with all the other factors on a case-by-case basis. *See, e.g., Design by Glory, Inc. v. Manhattan Creative Jewelers, Inc.,* 657 F.Supp. 1257, 1259 (S.D.N.Y.1987) (the existence of a related action does not require transfer).

The factors already discussed do not persuade us that transfer is appropriate. The actions involving Stokowski and the Association are related to some degree. Yet, the strength of defendants' motion, and the propriety of transfer, rest on the question of *how* interrelated the Association's claims are to Stokowski's.

Pursuant to a contract signed between Disney and Stokowski on January 18, 1939, Disney contracted with Stokowski to "employ and engage [Stokowski] ... to render and perform your services for us as hereinafter provided, in connection with the preparation of our photoplay now tentatively entitled the 'Concert Feature.'" Nowak Aff., Exhibit A at paragraph 3. This contract, to the extent it was inconsistent with an earlier contract executed in December 1937 relating to the production of "The Sorcerer's Apprentice," superseded the prior 1937 agreement. In particular, the 1939 agreement stated that "insofar as any such payments of percentages or royalties to you with reference to the said 'The Sorcerer's Apprentice' the said [1937] contract is hereby agreed to be fully cancelled and of no further force and effect." *Id.* at paragraph 2.

As part of the 1939 agreement, Stokowski promised:

> to use [his] best efforts, at your own expense, to obligate the Philadelphia Symphony Orchestra Association, Inc. to do said recording ... [Stokowski] further agree[s] to furnish [Disney] ... with a written commitment executed by the properly constituted and empowered authority granting ... [Disney] the right to use the said Philadelphia Symphony Orchestra, its name and the music rendered by it hereunder for the purposes herein provided and contemplated in this contract.

*Id.* at paragraph 6. Since Stokowski secured the Philadelphia Orchestra's services, and the recordings were completed, the only contract issues at stake involve whether Stokowski secured the necessary commitments from the Association for use of the Orchestra, its name, and the music it played for "Fantasia" and what royalties, if any, are owed to Stokowski and the Association.

Two provisions in the 1939 contract speak to the royalties relationship between Disney, Stokowski, and the Association. The 1939 contract states that, "Except as hereinafter provided, [Disney] shall have the right to use all orchestrations furnished hereunder without royalty or costs to us." *Id.* Since this agreement is only between Disney and Stokowski, this provision would seem to apply only to Stokowski and limits his rights only to the royalties detailed in the contract.

The contract further provides that "[a]ny royalties and license fees necessary for the use of music and/or orchestrations for the recordings hereunder shall be paid by [Disney]." *Id.* at paragraph 7. Read in conjunction with the first provision, the terms indicate that Disney is responsible for any other royalties or license fees owed to other entities for use of the music or orchestrations. As a result, the 1939 agreement implies that any royalties owed to the Association are

Disney's responsibility, and presumably governed by any agreements between Disney and such other entities, and the royalties owed to Stokowski are only those specified in the 1939 agreement.

The Association's rights flow from a single one-page contract dated January 11, 1939 between the Association and Michael Myerberg, agent for Stokowski and The Disney Studios. In it, the Association agreed "to furnish and grant to Leopold Stokowski and The Disney Studios the right to use the Philadelphia Orchestra for recordings in connection with this feature picture." Nowak Aff., Exhibit A. The Association further granted "the right to Leopold Stokowski and The Disney Studios, in connection with this feature picture, to use the name 'The Philadelphia Orchestra' on the screen and/or in all publicity and exploitation of said picture." *Id.*

As we noted earlier, the claims by Stokowski and the Association to royalties for "Fantasia" stem from separate contracts. Witnesses, presently unidentified, with information regarding one of the contracts will not necessarily have any evidence to offer regarding the other contract. We have no basis to assume that any witnesses in the Association's case possess any information concerning Stokowski's relationship with Disney and the intent behind their agreements.

In a further effort to bolster its argument that the Association's case is "central to" Disney's case with Stokowski, Disney points to a recent decision by the Eastern District of Pennsylvania in *Philadelphia Orchestra Ass'n v. The Walt Disney Co.*, 821 F.Supp. 341 (E.D.Pa.1993) (J. McGlynn). Disney contends that the court's decision on the Association's motion for partial summary judgment demonstrates the interplay between the two actions. In determining the meaning of the term "feature film" used in the Association's contract with Disney, the court made reference to the language in the 1939 Stokowski contract with Disney which defined the term "feature length photoplay." While noting that such a definition was omitted from the Association's agreement, the court viewed it as suggestive of Disney's understanding of "feature film." *Id.* at 345–46.

We do not view this as evidence that the Association's case is "central to" the action between Stokowski and Disney. If anything, Judge McGlynn's decision demonstrates that the 1939 agreement is only peripheral to the Association's case against Disney as some evidence of the parties' understanding of ambiguous terms in the Association's agreement. Addressing the 1939 contract with Stokowski, Judge McGlynn held that, "for obvious reasons, it does not resolve the ambiguity that exists in the agreement between Disney and The Orchestra Association." *Id.* at 347. The court further held that the Association was not a joint author of "Fantasia" under the Copyright Act of 1909 nor did Disney violate the Lanham Act by releasing home videos crediting the Orchestra for its performance. *Id.* at 347–49, 350–51. Obviously, the court did not view the Stokowski contracts as determinative, or even particularly illuminating for the Association's claims.

It is true that the Association attempted to argue that certain of its rights, in a sense, flowed through Stokowski's 1939 contract with Disney which made reference to the Orchestra. The court rejected this notion observing that Stokowski was more a conduit through whom Disney maintained control over the Orchestra. *Id.* at 349. We conclude that none these issues have any bearing on Stokowski's claims against Disney.

Disney also argues that it has a counterclaim against Stokowski for indemnification in the event Disney is held liable for royalties to the Association. We are unpersuaded that this is a reason, at this stage of litigation, to transfer the case to the Eastern District of Pennsylvania. At this point, Disney has no liability to the Association. Its counterclaim for indemnification would only arise if the Association prevails on its claims against Disney. Given the prematurity of Disney's indemnification claim, we give it little weight in the decision to transfer.

■ Lastly, Disney stresses that this court should adhere to the traditional "first to file" rule. Since Disney's case against Stokowski was filed 18 days before the present action, and the two cases are unquestionably the exact mirror image of each other, Disney urges us to transfer this action so that the

cases can be consolidated. We agree that the Muller/Disney cases are ripe for consolidation pursuant to Fed.R.Civ.P. 42(a). If Disney's action against Muller were transferred to this district, we would certainly consolidate them.

While the progress of the proceedings and discovery in the two Muller/Disney actions differ in no meaningful way, application of the "first to file" rule does favor transfer. The "prior pending action" rule generally means that "where there are two competing lawsuits, the first suit should have priority, absent the showing of balance of convenience ... or ... special circumstances." *First City Nat. Bank & Trust Co. v. Simmons*, 878 F.2d 76, 79 (2d Cir.1989). We do not apply the "first to file" rule mechanically.

We note that plaintiff initially advised Disney on November 10, 1992 that he was about to commence suit against Disney. The day before the deadline set by plaintiff, Disney requested more time to respond. Telephone calls ensued. Plaintiff alleges that Disney suggested mediation and later informed plaintiff that it would contact plaintiff in early January 1993 to relate Disney's position on settlement.

On December 30, 1992, Disney advised plaintiff that it would not negotiate any settlement. Disney filed its action against plaintiff in the Eastern District of Pennsylvania that same day. One might infer from the course of events that Disney used the prospect of settlement to delay Muller's filing of suit so that Disney could have the Stokowski action and the Association's existing action heard in the same district, obviously for its own convenience. While perhaps not the usual type of forum shopping, this suggests forum shopping of a sort. Disney's action is Philadelphia is primarily an action for a declaratory judgment, although an indemnification claim is included. Declaratory judgment actions filed in anticipation of a later-filed suit are frequently involved in "races to the courthouse." *See Don King Productions, Inc. v. Douglas*, 735 F.Supp. 522, 532 (S.D.N.Y.1990).

Further, despite defendants' contentions, the Eastern District of Pennsylvania's interests in the Muller/Disney actions seem almost non-existent. Philadelphia's interests in the Muller/Disney actions are not as pronounced as Disney urges. Where the Orchestra recorded the music for "Fantasia" and where Stokowski lived while the recordings were made have no relevance to the issues in the Muller/Disney actions. Stokowski's right to royalties will be decided based on the terms of his contracts with Disney.

Without question, Philadelphia has a great interest in the Association's action against Disney. However, New York's interest in the estates of its domiciliaries is no less significant. And in the case at bar, New York's interests clearly predominate.

As we have also noted, nothing suggests that any witnesses in Philadelphia, if any exist, will have any evidence bearing on the intent of Stokowski and Disney behind their contracts. Disney's arguments for transfer rest on the Association's suit being in Philadelphia and the fact that its filing in Philadelphia preceded Muller's filing in New York. Under the circumstances, we find these reasons insufficient.

After considering all the relevant factors, we do not find that Disney has made a convincing case for transfer. Convenience of the witnesses and access to sources of proof is purely speculative. Convenience of the parties favors New York, the plaintiff's chosen forum, and the location of Disney's main offices in the Northeast. The Association's action in Philadelphia, while marginally related, involves distinct legal issues arising from separate contracts and negotiations. It is not so interconnected as to justify transferring plaintiff's claims.

In addition, we are reluctant to transfer this action to a forum where personal jurisdiction over one of the parties is in doubt. There are grounds to doubt whether the Eastern District of Pennsylvania would have personal jurisdiction over Stokowski's estate. The claims between Disney and Stokowski do not arise out of any conduct by Stokowski in Philadelphia. All of the contracting activity between Disney and Stokowski occurred elsewhere. It also appears that Muller intends to move to dismiss Disney's action in Pennsylvania for lack of personal jurisdiction.

For all the foregoing reason, defendants' motion to transfer is denied without prejudice to renew if circumstances change such that reconsideration of a transfer would be merited.

■ Lastly, we address defendants' alternative motion to stay these proceedings. Disney stresses that this court should follow the well-known rule that "[w]here there are two competing lawsuits, the first suit should have priority, absent the showing of balance of convenience in favor of the second action, or unless there are special circumstances which justify giving priority to the second." *Fort Howard Paper Co. v. William D. Witter, Inc.,* 787 F.2d 784, 790 (2d Cir.1986)).

As we have explained, we view the balance of convenience favoring the plaintiff. While Disney's action against Muller in the Easter District of Pennsylvania was filed approximately twenty days before the present action, we are told that no discovery has taken place in either action. Since no witnesses have been identified, their convenience is not a factor, though New York and Philadelphia are in general proximity to each other. In addition, Michael Myerberg, who negotiated the contract with the Orchestra on behalf of Disney and Stokowski, had offices in California and New York. The convenience of the parties favors New York given that Disney has offices in New York and can easily litigate in any forum. We also noted that New York's interests in the Disney/Muller actions are plainly stronger than Philadelphia's. For the foregoing reasons, we decline to stay these proceedings.

SO ORDERED.